UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In re* Petition of

East Asian Consortium B.V.

For an Order to Take Discoovery from Bank of
Americoa N.A.; Bank of New York Mellon; BNP
Paribas USA; China Construcotion Bank; Citibank
N.A.; HSBC Bank USA N.A.;JPMorgan Chase
Bank N.A.; MashreqBank PSC; Standard Chartered
Bank; Wells Fargo Bank N.A.

Civil Action No. _____

Pursuant to 28 U.S.C. § 1782 in Aid of a Foreign
Proceeding

### DECLARATION OF MURAT SANIOĞLU

I, **MURAT SANIOĞLU**, declare as follows:

1.      I am an attorney duly admitted to practice in Republic of Turkey. I was a

Litigation Manager at Turkcell Iletşim Hizmetleri A.S, ("**Turkcell**") during the period 2011

to December 2020. Thus, the facts set forth herein are personally known to me, and, if called

as a witness, I could and would testify competently thereto.

2.      Turkcell is a joint stock company incorporated under the laws of the Republic

of Turkey. Turkcell is listed on both the Turkish and New York stock exchanges. Turkcell

is located at Turkcell Küçükyalı Plaza, Aydınevler Mahallesi İnönü Caddesi No:20 Küçükyalı

Ofispark B Blok – Maltepe, Istanbul, Turkey.

3.      Petitioner East Asian Consortium B.V., ("**EAC**") is a private company with

limited liability incorporated under the laws of the Netherlands and with its business address

at Rokin 55, 1012 KK Amsterdam, the Netherlands. EAC is a wholly owned subsidiary of



Turkcell Iletşim Hizmetleri A.S, ("**Turkcell**").

4.     The instant Petition arises out of court proceedings commenced by Turkcell and EAC against MTN Group Ltd., MTN International (Mauritius) Ltd., Mobile Telephone Networks Holding (Pty) Limited, MTN International (Pty) Ltd., Phuthuma Freedom Nhleko, and Irene Charnley (the "**First Defendant**," "**Second Defendant**," "**Third Defendant**," "**Fourth Defendant**," "**Fifth Defendant**," and "**Sixth Defendant**," respectively, and together the "**Defendants**") before the South Gauteng High Court, Johannesburg (the "**South African Court**," and the proceedings "**South African Proceedings**").[1] A true and correct copy of the Combined Summons in the South African Proceedings is attached hereto as **Exhibit A**.

5.     The First Defendant in the South African Proceedings is MTN Group Limited, a limited liability company incorporated under the laws of the Republic of South Africa. Exhibit A, at 1.

6.     The Second Defendant in the South African Proceedings is MTN International (Mauritius) Limited, a company incorporated under the laws of the Republic of Mauritius. The Second Defendant is a wholly owned subsidiary of the First Defendant. Exhibit A, at 2.

7.     The Third Defendant in the South African Proceedings is Mobile Telephone Networks Holdings (Pty) Limited, a company incorporated under the laws of the Republic of South Africa. The Third Defendant is a wholly owned subsidiary of the First Defendant. Exhibit A, at 2.

8.     The Fourth Defendant in the South African Proceedings is MTN International (Pty) Ltd, a company incorporated under the laws of the Republic of South Africa. The Fourth Defendant is a wholly owned subsidiary of the First Defendant.   Exhibit A, at 2.

9.     The Fifth Defendant in the South African Proceedings is Freedom Phuthuma

---

[1]     The proceedings at the South African Court are captioned as "*In the Matter between East Asian Consortium B.V. v. MTN Group Limited et al.*," Case Number 44462/2013, 26 November 2013 (the "**South African Proceedings**").

Nhleko. At all material times, Nhleko was a chairman of the First, Third, and Fourth Defendants, director of the First, Second, and Fourth Defendants, and Chief Executive Officer of the First Defendant. Exhibit A, at 2.

10.     The Sixth Defendant in the South African Proceedings is Irene Charnley. Charnley was a director of the First, Third, and Fourth Defendants. Exhibit A, at 2.

11.     Petitioner seeks the Court's assistance in obtaining Section 1782 discovery for use in the South African Proceedings, through which EAC has brought various claims against all Defendants regarding their unlawful actions in connection with their having dispossessed Petitioner of its rights in a particular GSM license award (the **"GSM License"**) tendered by the Islamic Republic of Iran (**"Iran"**).

12.     On October 25, 2003, Iran's Ministry of Communications & Information Technology (**"MCIT"**) launched an international tender for the first private GSM900/1800 license to build a GSM-type cellular phone system public network in Iran. At the time, the tender was the largest international telecommunications opportunity in the world, and, after the 1979 Revolution, the largest single investment opportunity in Iran.

13.     Several international companies participated in the tender. On February 18, 2004, Iran announced that the Turkcell Consortium, a joint venture involving Petitioner's predecessor (a joint venture formed by Turkcell and Ericsson Telekomunikasyan AS), Iranian Electronics Development Company (**"IEDC"**), and Parman Ertebat, was the winning bidder of the GSM License. A consortium comprising the First and/or Second and/or Third and/or Fourth Defendants came in second place in the bidding process.

14.     Petitioner was incorporated in April 2004 and upon incorporation accepted the benefits conferred on its predecessor through the Turkcell Consortium. As the winning bidder, the Turkcell Consortium was to have the exclusive right to, *inter alia*, negotiate with MCIT to finalize the license agreement in respect of the GSM License, and incorporate an operating company that would ultimately become the licensee of the GSM license



("**Operating Company**"). This understanding was enshrined in the final GSM license agreement ("**License Agreement**") executed between the Turkcell Consortium and MCIT on September 12, 2004. It was also understood within the Turkcell Consortium that the members of the Turkcell Consortium were to be the shareholders of the Operating Company.

15.     On June 2, 2005, Iran promulgated the Irancell Act. It required at least 51% of the shares in the license holder to be owned by Iranian legal and natural persons.

16.     On August 14, 2005, just as the Turkcell Consortium was finalizing the incorporation of an Operating Company in Iran, IEDC secretly registered and incorporated another company under the name "Irancell Telecommunications Services Company" ("**Irancell**"), which IEDC intended to become the Operating Company. IEDC named itself as the sole shareholder of the company.

17.     Subsequently, on August 17, 2005, in breach of the award of tender, MCIT and Irancell concluded a written addendum to the License Agreement. The written addendum provided that Irancell would be the Operating Company to hold the GSM License, effectively dispossessing Petitioner from its rights to the GSM License.

18.     On August 24, 2005, Petitioner demanded that MCIT and IEDC remedy their breaches and give effect to EAC's rights under the award of the tender and the License Agreement. MCIT and IEDC refused.

19.     Sometime in September 2005, Petitioner was forced to apply to the Tehran Public Court for an interdict against MCIT. While EAC's application in Iran was still pending, IEDC transferred what should have been Petitioner's rights in Irancell to the Second Defendant in the South African Proceedings.

20.     Thus, sometime between August 17, 2005 and September 18, 2005, the Second Defendant in the South African Proceedings came to replace Petitioner as the beneficial holder of a 49% share in the licensee, Irancell.

21.     On or about November 15, 2005, the Second Defendant entered into a

shareholders' agreement with IEDC in respect of Irancell.

22.     On November 27, 2005, MCIT issued the "License for the establishment and production of mobile telephone services" to Irancell.

23.     On February 19, 2006, the Tehran Public Court dismissed EAC's application.

24.     Thus, Petitioner was dispossessed of its rights in the first private GSM900/1800 license tendered by MCIT. It was unable to benefit in any way from the Licence Agreement and the granting of the GSM Licence, which it had won as a member of the Turkcell Consortium.

25.     Beginning in 2008, and before Petitioner became aware of the Defendants' involvement in the scheme to usurp Petitioner's rights in the GSM License, Petitioner and Turkcell commenced several arbitral proceedings to seek redress for the breaches committed by MCIT and IEDC.

26.     An ICC arbitration brought by Petitioner against IEDC resulted in an award finding that IEDC had not breached the shareholders agreement with Petitioner because, according to the ICC Arbitral Tribunal, IEDC had acted in good faith when renegotiating the interests in the Operating Company of the members of the Turkcell Consortium, following the Irancell Act's enactment.

27.     An arbitration brought by Turkcell against Iran pursuant to the 1996 Bilateral Investment Treaty between Iran and Turkey ("**BIT Arbitration**") was dismissed on jurisdictional grounds without any findings on the merits being issued.

28.     However, during the pendency of the BIT Arbitration, a former employee of the First Defendant, Mr. Christian Kilowan ("**Kilowan**"), came forward with whistle-blower allegations in relation to the manner in which the First, Second, Third, and/or Fourth Defendants had acquired their interest in the GSM License. Kilowan was employed by MTN and was based in Tehran, Iran during the spring of 2004 to November 2007. EAC learned from Kilowan that from February 2004 to September 2005, Defendants worked to deliberately



usurp Petitioner's interest in the licensee by persuading the Iranian government (including MCIT) and IEDC to breach or interfere with Petitioner's rights in the Turkcell Consortium (with respect to the tender award, the certificate read with the draft license agreement, and the License Agreement). As early as March 2004, the Defendants were lobbying various members of the Iranian Government in order to pursue their objective of removing EAC and becoming the 49% shareholder in the Operating Company that would hold the GSM License that had been awarded to the Turkcell Consortium.

29.     Petitioner also learned from Kilowan that the Fifth and/or Sixth Defendants acting alone, and/or in concert, and/or through other authorised representatives of the First, Second, Third, and/or Fourth Defendants, engaged in bribery and corruption to achieve their objective of removing EAC and having the Second Defendant become the 49% shareholder in the Operating Company that would hold the GSM License that had been awarded to the Turkcell Consortium.

30.     Specifically, Defendants paid bribes, gifts, and favours to certain Iranian and South African government officials with the intent to (i) influence South Africa's vote on Iran's nuclear programme at the International Atomic Energy Agency; (ii) facilitate defence procurement between the South African Ministry of Defence and the Iranian Ministry of Defence; and (iii) ultimately, usurp Petitioner's place as shareholder of the Operating Company that would hold the GSM License that had been awarded to the Turkcell Consortium.

31.     Additionally, on or about May 2005, the Sixth Defendant, representing the First, Second, Third, and/or Fourth Defendants promised to pay a substantial cash bribe to Mr. Javid Ghorbanoghli, ("**Ghorbanoghli**"), the then Iranian Deputy Foreign Minister, and former Iranian Ambassador to South Africa. The payment was organized through a sham consulting agreement ("**Consulting Agreement**") that the Second Defendant signed with a Dubai-based company called Aristo Oil International Services LLC sometime in 2006

("Aristo"). A true and correct copy of the Consulting Agreement is attached hereto as **Exhibit B**. The "services" to be provided under the Consulting Agreement in exchange for $400,000 were to "introduce MTNI to key roleplayers, arrange meetings and generally provide support and assistance during the negotiations and conclusion of the necessary agreements that will provide for MTNI's entry into the Iranian Mobile Market." Exhibit B, at 13. This agreement was entered into two years after the Turkcell Consortium had already been announced as the winning bidder of the GSM License.

32.     As a result of this new information provided by Kilowan, the South African Proceedings were commenced in November 2013.

33.     Among the evidence that has been submitted in the South African Proceedings are various invoices issued by Aristo to the First and Second Defendants seeking the payment of $400,000. Aristo issued an invoice to the Second Defendant on March 1, 2007, another invoice in the same amount to the First Defendant on March 2, 2007, and another invoice in the same amount to the First Defendant on April 3, 2007. True and correct copies of the Aristo invoices are attached hereto as **Exhibit C**.

34.     The invoices request payment to the account of a certain Mousa Hosseinzadeh ("**Hosseinzadeh**"), the Managing Director of Aristo and alleged relative and close friend of Ghorbanoghli.

35.     On April 4, 2007, the Third Defendant instructed The Standard Bank of South Africa Limited ("**Standard Bank**") to pay $400,000 to Hosseinzadeh ("**Bank Instruction**"). A true and correct copy of the Bank Instruction is attached hereto as **Exhibit D**.

36.     On April 4, 2007, the Third Defendant and Standard Bank entered into a spot contract ("**Spot Contract**"), to be executed on April 5, 2007, in the amount of $413,958.77. A true and correct copy of the Spot Contract is attached hereto as **Exhibit E**. Based on the April 4, 2007 Bank Instruction, $400,000 of this amount was intended for Hosseinzadeh.

37.     On April 5, 2007, Standard Bank sold $400,000 to the Third Defendant, and

the amount was subsequently transmitted to the beneficiary account of Hosseinzadeh held at the Commercial Bank of Dubai ("**Commercial Bank**") in the United Arab Emirates. The details of the payment state, "CONSULTING INVOICE DD MARCH 1, 2007." A true and correct copy of Standard Bank's Application to Purchase Foreign Currency is attached hereto as **Exhibit F**.

38.   In sum, Defendants' wrongful and unlawful actions deprived Petitioner of the business opportunities, turnover, and profits associated with the GSM License. Accordingly, EAC now seeks damages in the South African Proceedings in excess of $4.2 billion, plus interest.

I hereby declare under penalty of perjury under the laws of the United States of America that what is stated hereinabove is true and correct.

Date:   January 27, 2021
        Istanbul, Republic of Turkey

**MURAT SANIOĞLU**